UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

BARBARA J. ELDRED,

                         Plaintiff,

      v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

    Defendant.

Case No. 3:10-3092-AC

OPINION AND
ORDER

ACOSTA, Magistrate Judge:

    Plaintiff Barbara J. Eldred ("Eldred") challenges the final decision of the Social Security

Commissioner (the "Commissioner") finding her not disabled and denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") (collectively

"Benefits"). This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). For the reasons stated below, this court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Eldred applied for DIB and SSI on December 27, 2005, alleging an onset date of March 1, 2002, on each application. (Tr. at 95-100.) The Commissioner denied Eldred's applications initially and upon reconsideration. An Administrative Law Judge ("ALJ") held a hearing on June 25, 2008 (Tr. at 26-59), and subsequently found Eldred not disabled on August 12, 2008. (Tr. at 16-25.) On appeal, the Appeals Council accepted additional evidence into the record, but declined review of the matter on July 30, 2010. (Tr. at 1-3.) Accordingly, the ALJ's decision became the final decision.

## FACTUAL BACKGROUND

Eldred was born on December 4, 1958. (Tr. at 157.) She completed high school. (Tr. at 115.) Her past relevant work experience includes medical secretary, receptionist, and medical records clerk. (Tr. at 133.) She has not been involved in substantial gainful activity since 1993. (Tr. at 29.) Eldred alleges disability due to asthma, osteoporosis, menopause, migraines, and hyperparathyroidism. (Tr. at 60-80.) Eldred last met the insured status requirements entitling her to Benefits on December 31, 1998. (Tr. at 118.)

## MEDICAL HISTORY

In 1998, Eldred went to the emergency room complaining of shortness of breath and wheezing. (Tr. at 172.) The attending physician noted coughing associated with asthma and educated Eldred on the proper use of her inhaler, but did not find an emergent condition. (Tr. at 172.)

In August 1999, Eldred established care with Julie Newmann, PA-C. (Tr. at 204.) Eldred

reported a history of asthma, migraine headaches, insomnia, lower back pain, and menopause. (Tr. at 204.) In October, Newmann followed up with Eldred, prescribing Ambien for her insomnia, and Wellbutrin to help Eldred to quit smoking. (Tr. at 202.) In November, Newmann added Zoloft for Eldred's insomnia and to aid Eldred's feeling of being "a little bit depressed." (Tr. at 201.)

Eldred had a follow-up appointment with Newmann in early December 1999. (Tr. at 200.) At that time, Eldred reported her asthma was "under pretty good control" and that Zoloft was helping with insomnia and depression. (Tr. at 200.) Eldred requested that she be switched from Anaprox to Ibprofen for back pain, as she felt Ibprofen was more effective. (Tr. at 200.) In late December 1999, Eldred was admitted to the emergency room following an acute asthma attack and fever, likely from presumptive pneumonia. (Tr. at 177.) The attending physician noted Eldred had used amphetamines and barbiturates. (Tr. at 175.) Eldred was given Albuterol treatments via nebulizer, antibiotics, and steroids, was told to avoid using drugs of abuse, and was then released in early January 2000. (Tr. at 176-180.) Later that month, Eldred returned to the emergency room following a tick bite she received while cutting wood with her boyfriend, Kirk Davis. (Tr. at 198.)

In October 2002, after a twenty-two-month break in treatment, Eldred re-established care with Newmann. (Tr. at 195.) Eldred presented with an upper respiratory infection and monthly migraines cycling with her menstrual period. (Tr. at 195.) Newmann started Eldred on new asthma medications and refilled her medication for tension headaches. (Tr. at 195.)

In January 2003, Eldred strained her lower back while lifting a tray of canned goods off the ground. (Tr. at 194.) Newmann prescribed Ibprofen, Vicodin, and a muscle relaxant to treat the lower back spasms. (Tr. at 194.) In March, Eldred reported lower back spasms which "seem to be related to heavy lifting." (Tr. at 191.) Moist heat, stretching, and back exercises helped to relieve

her back pain. (Tr. at 191.)  Eldred felt her asthma was "under good control." (Tr. at 191.)  Eldred was "fairly satisfied" with her medication for tension headaches, but was open to seeing a neurologist to discuss other treatment options. (Tr. at 191.)  In September 2003, however, Eldred expressed concerns about her migraines, and was prescribed additional migraine medication ahead of schedule. (Tr. at 190.)

In January 2004, Eldred complained to Newmann of anxiety, menopausal symptoms, and insomnia. (Tr. at 189.)  Eldred "describe[d] a general irritability, overall anxious sensation that is present much of the time," occasionally causing "rapid heartbeat and some shortness of breath" which kept her from sleeping well. (Tr. at 189.)  Eldred stated she did not feel depressed and just wanted to feel "calmer and less irritable." (Tr. at 189.)  Though Eldred was having hot flashes and night sweats, it was primarily anxiety that kept her from sleeping well. (Tr. at 189.)  Newmann prescribed Paxil for Eldred's anxiety and Trazadone for insomnia. (Tr. at 189.)  Newmann also noted Eldred was "not officially employed but spends her days taking care of her landlord, who is recovering from heart surgery and their property." (Tr. at 189.)

During a follow-up appointment in March 2004, Eldred stated Paxil was helping with her anxiety, but she still felt hopeless or helpless at times. (Tr. at 188.)  Eldred was still having menopausal symptoms, primarily in the form of hot flashes, and stated Paxil seemed to be helping with this as well. (Tr. at 188.)

In May 2005, Eldred established care with Brandi Strong, M.D. (Tr. at 308.)  Eldred described herself as a "retired medical transcriber" who retired "due to stress." (Tr. at 308.)  In terms of health, Eldred's asthma was "fairly well controlled" with daily inhaler use. (Tr. at 308.)  Eldred continued to have menopausal symptoms and migraines, and Dr. Strong refilled Eldred's migraine

OPINION AND ORDER                                    4                                    {EAH}

medication, as well as her insomnia medication. (Tr. at 308.) Dr. Strong also refilled Eldred's

Ibprofen prescription to address "chronic severe back pain thought to be secondary to scoliosis." (Tr.

at 308.)

In August 2005, Eldred met with Dr. Strong with concerns about low back pain. (Tr. at 306.)

Eldred stated she had been having a lot of muscle spasms over the last few days. (Tr. at 306.) Dr.

Strong noted that Eldred reported she "has a lot of problems with morning stiffness where it takes

about an hour before she is really feeling good with the pain or feeling comfortable like she can

move." (Tr. at 306.) Eldred stated that Ibprofen was not helping, and she was hoping to start again

on Vicodin or Flexeril. (Tr. at 306.) Dr. Strong diagnosed a "low back strain, complicated by some

osteoarthritis" and prescribed Flexeril and Vicodin as Eldred requested. (Tr. at 306.) Eldred also

complained of insomnia, hot flashes, and mood swings related to menopause. (Tr. at 306.) Dr.

Strong started Eldred on low doses of hormone replacement therapy. (Tr. at 306.) Dr. Strong also

arranged a bone density scan, noting that Eldred was at "pretty high risk for osteoporosis." (Tr. at

306.)

Dr. Strong's predictions regarding osteoporosis were correct, and the bone density scan,

performed in October 2005, revealed osteoporosis in the hip and back. (Tr. at 304.) Dr. Strong

started Eldred on calcium, Fosamax, and hormone replacement therapy to treat the osteoporosis, and

also stated that she should be checked for hypothyroidism to rule that out as a secondary cause of

pain. (Tr. at 304.) Eldred complained of low back pain that made it difficult for her to sit, and

reported she generally took two Vicodin pills a day for pain. (Tr. at 303.) Dr. Strong thought the

pain was probably due to arthritis rather than osteoporosis, but refilled Eldred's Vicodin in a limited

quantity. (Tr. at 304.)

In January 2006, Eldred reported chronic pain in her low back and hips and insomnia. (Tr. at 303.) Eldred stated she "[had] to take a Vicodin to get going and then through the day" and that she "has tried to go back to work but really feels that she is unable to because of how much pain she is in." (Tr. at 303.) Dr. Strong noted Eldred was experiencing hip tenderness, but that Eldred was "not really having any nerves-type symptoms." (Tr. at 303.) Dr. Strong reassured Eldred that any fractures from osteoporosis would be obvious and she probably did not need an MRI at this point. (Tr. at 302.) Dr. Strong also gave Eldred stretching exercises, and recommended she see a chiropractor for pain, which Eldred said she could not afford. (Tr. at 302.)

In February 2006, Eldred completed a function report in support of her social security claim. (Tr. at 122.) Eldred stated she could walk for about 300 yards, stand for about twenty-five minutes at a time, sit for half an hour at a time, lift eighteen pounds, go grocery shopping and do laundry, but that "all things are limited [due] to pain." (Tr. at 122-127.) Eldred stated she could no longer work as a caregiver because she could not "lift or do the housework." (Tr. at 131.) Eldred also stated she had "extreme difficulty getting out of bed" and she needed assistance to sit up in the morning. (Tr. at 122.) Eldred also reported she did not cook because she could not stand at a stove "for any length to time due to extreme pain." (Tr. at 124.) Davis submitted a third-party report in March 2006, which stated Eldred could wash dishes, ride in a car, grocery shop, and walk for 300 yards. (Tr. at 141-148.)

Eldred consulted with Juanita Comt, M.D., regarding hyperparathyroidism in March 2006. (Tr. at 218.) Dr. Comt scheduled an MRI of Eldred's lumbar spine to check for compression fractures. (Tr. at 218.) The following day, Eldred requested and received pain patches for her back pain. (Tr. at 301.) The MRI showed L5-S1 level neural foraminal stenosis with resultant abutment

of the existing L5 nerve roots, and mild hypertrophic facet arthrosis at L3-L4 and L4-L5. (Tr. at 221-222.) At an appointment at Dr. Compt's office later that month, Eldred's hydrocodone prescription was refilled in a limited quantity, though the physician on staff recommended restarting Flexeril and starting yoga as non-narcotic method of treating her back pain. (Tr. at 301.)

In April 2006, Peter LeBray, Ph.D. performed a psychiatric review of Eldred's medical records (Tr. at 235.) Dr. LeBray found that Eldred had mild reactive depression/anxiety, but "nothing to suggest a severe functional impairment." (Tr. at 235.) Mary Ann Westfall, M.D. performed a physical residual functional capacity assessment in April 2006 as well. (Tr. at 237.) Dr. Westfall found Eldred could sit and stand for about six hours in an eight-hour workday. (Tr. at 238.) In terms of postural limitations, Dr. Westfall found that Eldred could occasionally climb, stoop, kneel, crouch, and crawl, and could frequently balance. (Tr. at 241.) Dr. Westfall also found Eldred would need to avoid even moderate exposure to hazards and vibrations due to her fairly severe osteoporosis, and avoid even moderate exposure to fumes due to her asthma. (Tr. at 241.) Dr. Westfall noted Eldred's statements were not consistent; Eldred reported she could walk three hundred yards before resting, but also stated she had such extreme pain that all she could do every day was wash the dishes. (Tr. at 242.)

In May 2006, Eldred met with Dr. Strong, who noted Eldred was still suffering from pain related to migraines and her back. (Tr. at 298.) Dr. Strong stated Eldred was "still complaining of a lot of pain in her right low back and into her legs, with weakness in her legs." (Tr. at 298.) Dr. Strong noted Eldred took 390 Vicodin pills in March, an amount which surprised Eldred. (Tr. at 298.) Eldred stated she did not know she had taken so many pills, especially since she "did not have much pain relief from [Vicodin] at all." (Tr. at 298.) Dr. Strong felt that Eldred had "severe

osteoporosis with what appears to be some chronic bone pain from [the osteoporosis]." (Tr. at 298.) Dr. Strong gave Eldred a prescription for a limited amount of Percocet. (Tr. at 298.) Eldred also had a consult with a surgeon, who did not feel that Eldred would benefit from surgery for her back. (Tr. at 298.)

In August 2006, Dr. Strong noted the Percocet seemed to be helping the chronic pain, though Eldred was still "having quite a lot of pain, particularly in her hips." (Tr. at 296.) Dr. Strong noted the bone pain "does seem to be much out of proportion than I would expect" from hyperparathyroidism. (Tr. at 296.) Dr. Strong stated the pain "seems to be secondary to severe osteoporosis" and could potentially be related to hyperparathyroidism. (Tr. at 296.) Dr. Strong noted Eldred "is at the point now where she really is afraid of doing anything because she is afraid of falling and breaking things." (Tr. at 296.) Dr. Strong ordered imaging, which revealed scattered foci in the left posterior ribs, "most likely representing fractures." (Tr. at 322.)

In November 2006, Dr. Strong noted Eldred's pain, which "seems to be due to significant osteoporosis as well as osteoarthritis" had improved to a level three or four, which made her "a little more active and able to get out of bed and about." (Tr. at 294.) Eldred was managing her pain fairly well with Percocet. (Tr. at 294.) Dr. Strong also noted Eldred's asthma was "doing excellent," though she was still having trouble with insomnia. (Tr. at 294.)

In March 2007, Eldred told Dr. Strong that her pain from osteoporosis and osteoarthritis was manageable if Eldred was not active, but being active caused significant pain. (Tr. at 292.) Eldred stated her quality of life was "very limited" as a result. (Tr. at 292.) Dr. Strong noted that Eldred had "a very antalgic gait" and was "quite stiff with getting up." (Tr. at 292.) Dr. Strong was still unsure if Eldred had hyperparthyroidism. (Tr. at 292.)

In September 2007, Eldred met with endocrinologist James Theen, M.D., regarding chronic pain, osteoporosis, and potential hyperparathyroidism. (Tr. at 263.) Dr. Theen noted that Eldred had osteoporosis both of the hips and the spine, though "no evidence of fracture." (Tr. at 263.) Dr. Theen explained to Eldred he did not believe her chronic pain was caused by osteoporosis, as "everything I know about osteoporosis indicates that metabolic bone disease does not cause pain unless there is a fracture." (Tr. at 263.) Dr. Theen recommended further tests to check for hyperparathyroidism. (Tr. at 266.)

In October 2007, Dr. Strong met with Eldred regarding her lab results and to follow up on chronic pain. (Tr. at 286.) Fosamax appeared to be helping Eldred's osteoporosis; the lab reports showed "excellent improvement" in Eldred's T scores on the AP spine, and "good improvement" of the hip scores. (Tr. at 286.) Eldred reported increased pain in her back, however, which caused Dr. Strong to schedule x-rays to check for possible compression fractures. (Tr. at 286.) The imaging performed later that month revealed  moderate degenerative disc disease at the L5-S1 level. (Tr. at 309.) In terms of Eldred's habits, Eldred reporting smoking at least a pack of cigarettes and drinking around five or six beers per day. (Tr. at 286.) Dr. Strong wrote a prescription for Chantix and encouraged Eldred to cut down her alcohol consumption. (Tr. at 286.)

In November 2007, Eldred was again admitted to the emergency room following a tick bite. (Tr. at 270.) In a follow-up regarding Eldred's tick bite, Dr. Strong noted in Eldred's social history that she smokes half a pack to one and a half packs of cigarettes per day and "possibly has some alcoholism issues." (Tr. at 277.) Eldred also reported being "unable to work currently because of her osteoporosis and pain." (Tr. at 277.)

In December 2007, Eldred went to the emergency room following an asthma attack. (Tr. at

347.) Eldred also described significant back pain, ranking it a ten out of ten in intensity. (Tr. at 347.) Eldred stated that her asthma symptoms had worsened over the previous week. (Tr. at 347.) The physician on duty noted acute asthma exacerbation, acute bronchitis, acute exacerbation of back pain, and acute alcohol intoxication. (Tr. at 349.) Eldred was given acute nebulizer treatment and advised to stop smoking and drinking alcohol. (Tr. at 349.) Eldred reported smoking half a pack of cigarettes a day. (Tr. at 347.)

In March 2008, Eldred followed up with Dr. Strong with regard to chronic pain. (Tr. at 362.) Eldred reported "quite a bit of pain in her back," which was moving into her thoracic back and her hip. (Tr. at 362.) However, Dr. Strong remarked during the physical examination that Eldred was "just mildly tender" to palpation over the lumbar spine, and was able to walk on her heels and toes without difficulty. (Tr. at 362.) Dr. Strong noted the etiology of Eldred's osteoporosis was unclear, and that she had chronic pain from multiple etiologies, which was controlled reasonably well with five Percocet pills per day per her pain management contract. (Tr. at 362.) Eldred also stated at the appointment that she had tried to quit smoking using Chantix, but the drug caused her to have hallucinations. (Tr. at 37.)

In April 2008, Eldred presented with a right-sided facial droop, as well as some left-sided weakness. (Tr. at 359.) Dr. Strong thought Eldred may have had a transient ischemic attack, and ordered an echocardiogram and carotid ultrasound. (Tr. at 359.) The echocardiogram found the droop was likely caused from a patent foramen ovale, or hole in the heart. (Tr. at 353.) During testing, Eldred also noticed a significant weakness on the left side of both the upper and lower extremities, and chronic lower extremity weakness from her back pain. (Tr. at 361.) Dr. Strong also noted taking Fiorinal with codeine was working for Eldred's migraines, as Eldred "has not had any

OPINION AND ORDER                          10                          {EAH}

problems with headaches." (Tr. at 361.)

Dr. Strong referred Eldred to Chuck Huang, M.D., for a consultation regarding hyperparathyroidism later in April 2008. (Tr. at 373.) Dr. Huang did not find evidence of hyperparathyroidism, though he recommended a third bone scan in October 2008 or 2009 to monitor Eldred's osteoporosis. (Tr. at 374.) Dr. Huang also emphasized the importance of stopping smoking, and advised Eldred to obtain assistance for alcohol abuse. (Tr. at 374.) Eldred reported she smoked half a pack of cigarettes a day for the last twenty years. (Tr. at 379.) He also recommended a home safety evaluation for fall prevention. (Tr. at 374.)

## HEARING TESTIMONY

At the hearing on June 25, 2008 in Medford, Oregon, Eldred testified that she last worked in 1993, as a medical secretary, and quit after the physician she was working for lost his practice. (Tr. at 30-31.) Eldred stated that in approximately 2004, her physical conditions became an issue with regard to work. (Tr. at 31.) Eldred testified she could set a table and cook, but did not try to lift anything heavy for fear of fracturing her spine. (Tr. at 31.) She testified she had weakness in her left lower extremity and her left arm. (Tr. at 37.) When asked if she could manage a job doing extremely light paperwork eight hours a day, five days a week, Eldred testified she did not know if she could do it for eight hours a day. (Tr. at 38.) Eldred testified that before being diagnosed with osteoporosis, she cleaned houses for people in her old neighborhood, but eventually stopped due to pain. (Tr. at 38.) In regard to alcohol use, Eldred testified she last consumed alcohol three days prior, which included "at least two or three beers." (Tr. at 49.)

Kirk Davis has lived with Eldred since 1997. (Tr. at 29.) Davis reported Eldred cannot stand for very long and has great difficulty doing chores around the house. (Tr. at 29.) Davis testified that

OPINION AND ORDER                              11                              {EAH}

Eldred has difficulty riding in a car because Eldred "just starts getting really sore and achy and her back just bothers her all the time." (Tr. at 52.)

Lynn Jones, a vocational expert, testified at the request of the ALJ. (Tr. at 53.) The ALJ asked Jones if a forty-nine year-old individual with a high school education who could lift ten pounds frequently and twenty pounds occasionally, and sit, stand, and walk up to six hours each with the opportunity to change positions, could perform medical secretary work. (Tr. at 54-55.) Jones responded that she would be able to, and could also perform other sedentary jobs such as a charge account clerk. (Tr. at 56-57.) Eldred's attorney then asked Jones if an individual who could not sit up to two hours in an eight hour day or stand/walk six hours in an eight hour day would be able to perform medical secretary work. (Tr. at 57.) Jones responded that the person would not. (Tr. at 57.)

### SUMMARY OF THE ALJ'S FINDINGS

The ALJ engaged in the required five-step "sequential evaluation" process when she evaluated Eldred's disability. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.    Steps One and Two

The ALJ concluded Eldred had not engaged in substantial gainful activity since the onset of her alleged disability in 2002. (Tr. at 18.) The ALJ determined Eldred suffered from the severe impairments of asthma, degenerative disc disease, osteoporosis, and history of substance abuse. (Tr. at 18.) The ALJ concluded that Eldred also suffered from headaches, a transient ischemic attack (TIA), depression, anxiety, menopausal symptoms, and a hole in the heart, all of which she characterized as non-severe. (Tr. at 18.) The ALJ's specific findings as to each impairment are

OPINION AND ORDER                        12                        {EAH}

detailed below.

A.    *Asthma*

In evaluating Eldred's asthma, the ALJ relied on the emergency room report from 1998 where the attending physician noted coughing associated with asthma and gave Eldred instructions on the proper use of her inhaler and a prescription for Albuterol. (Tr. at 18.) The ALJ also relied on emergency room records from December 1999 where Eldred was diagnosed with acute asthma and presumptive pneumonia, for which she was given antibiotics and steroids, as well as emergency room records from December 2007 following acute exacerbation of asthmatic bronchospasms, for which she was given acute nebulizer treatment. (Tr. at 19.)

B.    *Degenerative Disc Disease*

In determining that Eldred's degenerative disc disease was a severe impairment, the ALJ relied on a March 2006 MRI showing L5-S1 neural foraninal stenosis with resultant abutment of the existing L5 nerve roots, and imaging from October 2007 showing moderate degenerative disc disease at the L5-S1 level and mild hypertrophic facet arthrosis at L3-L4 and L4. (Tr. at 19.)

C.    *Osteoporosis*

The ALJ relied on a bone scan in January of 2006 which showed osteoporosis in Eldred's hips and back, and also mentions an MRI of the lumbar spine on March 20, 2006. (Tr. at 19.) The ALJ also looked to Dr. Theen's assessment in September 2007 that Eldred had osteoporosis of both the hips and the spine, and imaging from August 2006 showing increased activity involving the left posterior ribs, most likely representing rib fractures. (Tr. at 20.)

D.    *History of Substance Abuse*

The ALJ determined that Eldred had a history of substance abuse based on notes in the record

from various providers. (Tr. at 20.) The ALJ pointed to Eldred's 2000 emergency room visit for asthma exacerbation in which she tested positive for barbiturates and amphetamine; October 2007 treatment notes from Dr. Strong where Eldred reported drinking five or six beers a day; and the December 2007 emergency room visit for an asthma attack in which she tested positive for alcohol. (Tr. at 20.) The ALJ also considered Eldred's testimony that she had alcohol three days prior to her testimony, which included "at least two or three beers." (Tr. at 20.)

E.    *Headaches*

Though the ALJ acknowledged that Eldred reported migraines and had taken medication for headaches in the past, the ALJ pointed to the April 2008 note where Dr. Strong stated Eldred, who was taking Fiorinal with codeine, "had not had any problems with headaches." (Tr. at 20.) The ALJ determined that since Eldred's headaches responded to medication, they are a non-severe impairment. (Tr. at 20.)

F.    *Transient Ischemic Attack (TIA)*

The ALJ acknowledged that Eldred may have had a TIA in April of 2008, as a CT scan showed minimal bilateral cerebral atrophy, but determined that the TIA was not a severe impairment. (Tr. at 20.)

G.    *Depression and Anxiety*

In August 1999, Eldred's primary care provider at the time reported that Eldred felt "a little bit depressed," and prescribed Zoloft to help with both depression and insomnia. (Tr. at 201.) In January 2004, Dr. Strong prescribed Paxil after Eldred reported having problems with anxiety. (Tr. at 189.)  Because Eldred's anxiety and depression appear to be controlled by medication and the exhibits do not reference impairments due to either condition, the ALJ determined that neither

OPINION AND ORDER                        14                        {EAH}

depression nor anxiety were severe impairments.  (Tr. at 20.)

   *H.*    *Menopausal Symptoms/Hole in Heart*

   The ALJ acknowledged Eldred complained of menopausal symptoms at her earlier medical

appointments and that abnormalities at an April 2008 appointment echocardiogram may have been

caused by a hole in her heart.  (Tr. at 20.)  The ALJ stated because neither impairment is medically

determinable and or expected to last at a "severe" level for at least a year, both conditions are non-

severe.  (Tr. at 20.)

II.    Step Three

   The ALJ determined that Eldred's impairments do not meet or medically equal any of the

listings set forth in the regulations, specifically listings 3.03 for asthma, 1.04 for disorders of the

spine, and 1.02 for major dysfunction of the joints.  (Tr. at 21.)

V.    Step Four

   If adjudication proceeds beyond step three the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's

RFC is an assessment of work-related activities the claimant may still perform on a regular and

continuing basis, despite limitations imposed by his impairments.  20 C.F.R.§ 404.1520(e); Social

Security Ruling ("SSR") 96-8p.

   The ALJ uses this information to determine if the claimant can perform his past relevant

work at step four.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can perform his past relevant

work, he is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of his past

relevant work the ALJ proceeds to step five.

   The ALJ found Eldred has the following residual functional capacity ("RFC"):

"The claimant can lift and/or carry ten pounds frequently. The claimant can lift and/or carry no more than twenty pounds at one time. The claimant can sit/stand and/or walk up to six hours each out of an eight hour weekday, with frequent position changes. The claimant can occasionally climb, stoop, kneel, crouch and crawl. The claimant cannot climb ropes, ladders or scaffolds. The claimant cannot work on uneven surfaces. The claimant must avoid even moderate exposure to vibrations, fumes and hazards."
(Tr. at 21-22.)

The ALJ concluded Eldred was capable of performing her past relevant work as a medical secretary, receptionist, and medical records clerk. (Tr. at 24.) The ALJ determined that Eldred's statements regarding the intensity, persistence, and limiting effect of her symptoms were not credible to the extent they were inconsistent with Eldred's RFC. (Tr. at 22.) In evaluating Eldred's credibility, the ALJ looked to Eldred's descriptions of daily activities, such as taking care of her landlord; Davis' descriptions of Eldred's daily activities, such as washing dishes and grocery shopping; Eldred's descriptions of pain compared to the findings of her providers; confrontation by her primary care provider about overuse of Vicodin; Eldred's continued smoking; and Eldred's statements regarding her reasons for stopping work. (Tr. at 22-23).

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Commm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins*, 466 F.3d at 882. Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

ANALYSIS

Eldred asserts that the ALJ erred on the following grounds: (1) The ALJ improperly interpreted statements regarding Eldred's credibility; (2) the ALJ did not consider the combined impact of Eldred's medical impairments; and (3) the ALJ improperly based her decision on the opinion of the vocational expert.

I.    Claimant's Credibility

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).

In assessing the claimant's credibility, the ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284; *see also* SSR 96-7p at *3 (available at 1996 WL 374186). The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing

inconsistent statements regarding statements by the claimant. *Smolen*, 80 F.3d at 1284. After a claimant establishes an impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

### A. Daily Activities

The ALJ's decision regarding Eldred's credibility was based in part on the fact that Eldred "described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. at 22.) The ALJ cited Eldred's statements that in January 2000, she was cutting wood with Davis; and in January 2004, she was working under the table taking care of her landlord. (Tr. at 22.) The ALJ also looked at Eldred's February 2006 function report, where Eldred reported she could launder her own clothes, grocery shop, walk about 300 yards, lift eighteen pounds, stand for twenty-five minutes at a time, and sit for half an hour at a time, as well as Eldred's boyfriend's third-party report stating Eldred could wash dishes, ride in a car, grocery shop, and walk for 300 yards. (Tr. at 22.) Eldred contends the statements regarding caretaking work are vague and give no information on the level of exertion required, and her other daily activities are not inconsistent with her complaints.

The ALJ did not err in finding that Eldred described daily activities not limited to the extent one would expect. In regard to work activity, the record includes substantial evidence Eldred worked as a caregiver between March 2002 and March 2004. In her applications for Benefits, Eldred stated that between March 2002 and June 2003 she worked eight-hour days, seven days a week, as a caretaker for friends she lived with – a job that required lifting and doing housework. (Tr. at 110, 131.) In January 2004, Eldred told Newmann that she while she was not officially employed, she

"spends her days taking care of her landlord, who is recovering from heart surgery and their property." (Tr. at 189.) In March 2004, she told a treating provider she was a care provider and lived with two elderly women. (Tr. at 188.) While claimants are not required to be utterly incapacitated to be eligible for benefits, the fact that a claimant can hold a job "with a fair amount of success" is relevant in credibility determinations. *Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992). In this case, the fact that Eldred performed housework, including lifting, for others for two years demonstrates that Eldred held a position "with a fair amount of success" and suggests that Eldred was not impaired to the point of disability during that period.

The ALJ also properly found that Eldred's descriptions of daily activities were inconsistent with her reports of pain symptoms. In January 2006, Eldred described being "in very chronic pain" (Tr. at 303.). In her February 2006 function report Eldred stated she had "extreme difficulty getting out of bed," she needed assistance to sit up in the morning, that she could not stand at a stove "for any length to time due to extreme pain." (Tr. at 122, 124.) The ALJ correctly found this report contradicted Eldred's statements and Davis's statements that Eldred could wash dishes, walk for 300 yards, and shop for groceries. Eldred's inconsistent statements regarding her level of function are a proper basis for rejecting her credibility.

### B. *Medical Evidence*

The ALJ also found that Eldred's "alleged limitations and pain exceed the findings of the objective evidence." (Tr. at 22.) The ALJ specifically looked to Eldred's March 2008 appointment with Dr. Strong where Dr. Strong noted that Eldred was "just mildly tender" down the lumbar spine and vertebral column, despite Eldred's report to Dr. Strong that she was in chronic pain. (Tr. at 22-23.) The ALJ additionally looked to October 2007 imaging which showed moderate degenerative

disc disease at the L5-S1 level, but no evidence of fractures, and Dr. Theen's statements in September 2007 that Eldred "had no evidence of fracture." (Tr. at 23.) The ALJ also considered Dr. Strong's statement in August 2006 that Eldred's bone pain was "out of proportion." (Tr. at 23.) The ALJ additionally considered conservative treatment options, looking to the May 2006 consult with a surgeon who felt that Eldred would not benefit from surgery (Tr. at 298), notes from an examining physician in March 2006 suggesting that Eldred try yoga and Flexeril rather than narcotics for back pain (Tr. at 301), and a January 2006 note from Dr. Strong recommending a chiropractor and stretching exercises. (Tr. at 302.) The ALJ contrasts these findings with Eldred's reports of severe pain, including Eldred's request for pain patches in March 2006, to show that Eldred's reports of pain were out of proportion with the objective findings of her treating physicians. (Tr. at 23.)

Eldred contends that the ALJ did not properly interpret the medical evidence related to Eldred's credibility. Specifically, Eldred takes issue with the ALJ's reliance on Dr. Theen's statement in September 2007 that Eldred "had no evidence of fracture." (Tr. at 263.) Eldred argues Dr. Theen did not have a proper basis for this statement, as he did not have a current bone scan, x-ray, or MRI to base his assessment on. However, Dr. Theen based his assessment on a review of Eldred's medical records and laboratory studies through October 2006. (Tr. at 263.) Additionally, Dr. Strong told Eldred in January 2006 that an MRI probably was not necessary as fractures from osteoporosis "are going to be pretty obvious." (Tr. at 302.) Even if a bone scan, x-ray, or MRI were necessary for a proper diagnosis, the ALJ's reliance on Dr. Theen's statement would have been harmless error: x-rays in October 2007, shortly after Dr. Theen's examination of Eldred, did not reveal fractures.

Eldred also takes issue with the ALJ's interpretation of Dr. Strong's statement in August

OPINION AND ORDER                    20                    {EAH}

2006 that "[Eldred's] bone pain was out of proportion." Eldred contends the ALJ used the statement to imply that Dr. Strong questioned the credibility of Eldred's pain complaint, when the correct interpretation of the statement is that Dr. Strong was merely seeking a medical explanation for the pain. The ALJ's interpretation of this statement is not in error. When Dr. Strong wrote Eldred's bone pain was out of proportion, Dr. Strong knew that Eldred's first test for hyperparathyroidism showed normal results and there was no evidence of fractures of microfractures. Because Dr. Strong had ruled out the likely causes of Eldred's pain, the ALJ's interpretation of Dr. Strong's statement as questioning Eldred's credibility is reasonable.

Eldred further contends that her testimony should not have been rejected based on the fact that objective evidence does not support the extent of pain claimed. While lack of medical evidence cannot form the *exclusive* basis for discounting pain testimony, the ALJ may consider it as a factor in a larger credibility determination. *Burch*, 400 F.3d at 680 (9th Cir. 2005). In this case, the ALJ also considered Eldred's inconsistent statements regarding pain, her misuse of pain medication, and her continued smoking despite knowing it exacerbated her asthma. Lack of medical evidence was properly considered as one factor in the ALJ's larger credibility analysis.

### *C. Medication*

The ALJ stated that medication "succeeded in controlling most her symptoms and there is some indication of the misuse of pain medication." (Tr. at 23.) The ALJ properly found that Eldred made inconsistent statements regarding her level of pain. The ALJ references Dr. Strong's statement in November 2006 that "Percocet is managing her pain fairly well" (Tr. at 294), and her statement in March 2008 that Eldred's back pain was "fairly well controlled by the Percocet." (Tr. at 362.) This contrasts directly with Eldred's statement to Dr. Strong in April 2008, when she was taking

Percocet, that she was "unable to work due to. . . severe pain." (Tr. at 359.)

In regard to misuse of pain medication, the ALJ points to Eldred's May 2006 appointment with Dr. Strong where Dr. Strong confronted Eldred about taking 390 Vicodin pills during the month of March 2006, and told Eldred that her pain medication prescriptions would be limited. (Tr. at 23.) During Eldred's emergency room visit in December 1999 following an asthma attack, the attending physician noted that Eldred had used amphetamine and barbiturates, and advised her to avoid abusing drugs. (Tr. at 175.) Documented concerns about drug misuse from treatment providers constitute substantial evidence to support an ALJ's credibility findings. *Butler v. Astrue*, CV-08-0153-CI, 2009 WL 1108504 at *6 (E.D. Wash. Apr. 24, 2009).

### D. Asthma

In regard to asthma, Eldred contends that the ALJ erred in relying on reports of Eldred's continued smoking as a basis for rejecting the credibility of her symptom testimony. The ALJ looked to five notes from medical providers from 1999 to 2008 encouraging Eldred to quit smoking. (Tr. at 23.) In October 2007, Eldred reported smoking a pack of cigarettes per day or more. (Tr. at 286.) In November 2007, Eldred stated she smoked between half a pack to one and a half packs of cigarettes a day. (Tr. at 277.) In April 2008, Eldred said she smoked half a pack of cigarettes per day over the last twenty years. (Tr. at 379.) Eldred contends she tried to quit smoking in 1999 by using Wellbutrin, and in 2008 using Chantix, but "felt a little bit depressed" from Wellbutrin (Tr. at 201) and had hallucinations from Chanix. (Tr. at 37.) Eldred argues she should not be punished for failing to quit when she suffered significant side effects from these drugs.

The fact that a claimant smokes despite medical advice not to is relevant to an ALJ's credibility analysis. *Saephan v. Barnhart*, 2004 WL 329332, at *5 (N.D. Cal. Feb. 18, 2004); *see*

*also Reynolds v. Astrue*, 252 F. App'x 161, 165 (9th Cir. 2007); *Arant-Livingston v. Barnhart*, 148 F. Appx. 630, 631 (9th Cir. 2005). However, successfully quitting smoking for significant periods is also relevant. *See Willcutt v. Astrue*, 2009 WL 2413280, at *4 (E.D. Wash. Aug. 3, 2009) (ALJ erred in impugning claimant's credibility based on claimant's smoking, when claimant made ongoing efforts to quit smoking, and at the time of the ALJ hearing had been smoke-free for about a year and a half with one relapse).

In this case, the ALJ correctly found Eldred's continued heavy smoking to be a reason to discount her credibility. Though Eldred tried medications to help her to stop smoking, there is no evidence that she actually quit for any length of time. While Eldred did report side effects from two anti-smoking medications, the side effects of one (Wellbutrin) were not significant compared to the consequences of twenty years of heavy smoking. The ALJ's decision regarding Eldred's smoking is based on substantial evidence.

### E. Reasons for stopping work

The ALJ also stated "there is evidence that the claimant stopped working for reasons not related to allegedly disabling impairments." (Tr. at 23.) ALJ specifically looked to Eldred's statement that she stopped working as a medical transcriber "due to stress." (Tr. at 308), a contrast to Eldred's statement in her application for Benefits that she stopped working as a medical transcriber because of illness, injury, or conditions. (Tr. at 110.) While these statements are contradictory, they do not impact the analysis of Eldred's credibility. Eldred stopped working in 1993 (Tr. at 30), nine years before her alleged onset date. (Tr. at 95-100.) The reason Eldred stopped working in 1993 is not relevant to determining whether she was disabled in 2002. Because the ALJ provided other clear, convincing, and sufficiently specific reasons for her credibility

OPINION AND ORDER                          23                          {EAH}

decision, however, the error is harmless. *Stout v. Commissioner*, 454 F.3d 1050, 1054 (9th Cir. 2006).

### F. Non-examining physician opinion

Eldred contends that the ALJ erred in relying on Dr. Westfall's testimony that Eldred's descriptions of pain were "inconsistent with the medical objective data." Eldred argues that objective medical data is not a valid criteria for evaluating credibility, and that non-examining physician records deserve little weight.

Though medical objective data cannot be the exclusive basis for rejecting a claimant's pain testimony, it can be a factor in the ALJ's credibility determination. *Burch*, 400 F.3d at 680. Additionally, the opinion of non-examining medical advisors may serve as substantial evidence when they are supported by and consistent with other evidence in the record. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999).

In this case, the ALJ correctly gave weight to Dr. Westfall's opinion. Though Dr. Westfall's opinion was the only comprehensive statement regarding Eldred's ability to work, it is consistent with statements from Eldred's treating physicians. Dr. Westfall found Eldred's descriptions of extreme pain and limitations, such as being able to walk only 300 yards without resting, "not fully credible." (Tr. at 242.) Dr. Strong noted that Eldred had moderate degenerative disc disease at L5-S1 (Tr. at 309), but did not find Eldred's condition would reasonably produce extreme pain. Indeed, Eldred's treating physicians never stated Eldred should limit her activity level.

### II.    Combined Impact of Impairments

Eldred argues that the ALJ did not properly consider the cumulative effect of Eldred's impairments. The ALJ must consider whether the combined effect of all of a claimant's impairments

results in disability. 20 C.F.R. § 404.1523. Discussing each impairment, including all impairments supported by substantial evidence in the hypothetical asked to the vocational expert, and specifically stating that the impairments were considered in combination, is sufficient to satisfy this requirement. *Vinson v. Massanari*, 155 F. Supp. 2d 1277, 1285 (D. Kan. 2001).

In this case, the ALJ properly considered the combined effect of Eldred's impairments. The ALJ discussed the medical evidence regarding each impairment and addressed the effect of Eldred's impairments at each stage of the analysis. The ALJ specifically stated she considered all of Eldred's impairments in combination, and her hypothetical question to the vocational expert included limitations based on each impairment. The ALJ properly considered the cumulative effect of Eldred's impairments.

III.    Vocational Expert

Eldred argues that the vocational expert relied on an incomplete hypothetical which failed to accurately reflect Eldred's condition. In determining if the claimant can perform work in the national economy, the ALJ may draw upon the testimony of a vocational expert. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). The ALJ's questions to the vocational expert must include limitations that are properly supported by the record. *Id.*

Eldred alleges that the vocational expert's hypothetical was based on Dr. Westfall's opinion, which did not accurately reflect Eldred's condition. As discussed above, however, Dr. Westfall's opinion regarding Eldred's pain testimony was reasonable and consistent with Eldred's treating physicians. Eldred also contends the ALJ disregarded the vocational expert's testimony that an individual who could not sit up to two hours and stand or talk up to six hours in an eight-hour day would not be able to perform any job existing in significant numbers in the national economy.

However, Dr. Westfall found Eldred *could* sit up to two hours and stand or talk up to six hours in

an eight-hour day (Tr. at 238), rendering the vocational expert's testimony on this point irrelevant.

<u>CONCLUSION</u>

The Commissioner's findings on Eldred's disabilities, considering the record as a whole, are

supported by substantial evidence.  The decision of the Commissioner is AFFIRMED.

DATED this 28 day of November, 2011.

JOHN V. ACOSTA
United States Magistrate Judge